**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: CHEERIOS MARKETING AND SALES PRACTICES LITIGATION | Civil Action No.: 09-cv-2413 |
| | MDL Docket No.: 2094 |
| | ALL CASES |
| | **MEMORANDUM AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendant General Mills, Inc.'s ("Defendant") a motion for summary judgment. More specifically, the issue is whether the Plaintiffs have suffered any concrete or particularized injury in order to have standing to sue. See *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. Appx. 257 (2010). On or about January 4, 2010, Plaintiffs, consumers who purchased Cheerios®[1] cereals produced and distributed by General Mills, Inc., filed a consolidated amended class action complaint (Amended Complaint). Plaintiffs allege eight causes of action in the Amended Complaint: (1) a violation of the Minnesota Consumer Fraud Act; (2) a violation of the Minnesota Unlawful Trade Practices Act; (3) a violation of the Minnesota Deceptive Trade Practices Act; (4) a violation of the Minnesota False Statement in Advertising Act; (5) a violation of state consumer protection laws; (6) breach of express warranty; (7) breach of implied warranty of merchantability and fitness for a particular purpose; and (8) unjust enrichment.

---

[1]    Although Cheerios® is a registered trademark of General Mills, in this opinion the Court refrains from using the such marks for the sake of convenience.

1

About a year ago, the Court denied a motion to dismiss for failure to allege a cognizable harm or a reasonable means to measure damages, and instead ordered limited discovery. Limited discovery seemed reasonable based on counsel's oral representation that Plaintiffs could not show any injury since Plaintiffs did not know the cost of Cheerios upon which damages would be calculated; and other plaintiffs ate all of the Cheerios purchased for reasons unrelated to the claims brought in this case. As such, limited discovery focused on whether the Plaintiffs's could establish quantifiable damages. In addition, another issue arose as to the choice of law issue; i.e. whether Minnesota law (where General Mills is headquartered) should apply in this case. Pursuant to the discovery schedule, limited discovery consisting of interrogatories, document production and depositions was conducted. Upon completion of this discovery, General Mills filed a motion for summary judgment.

## Facts

Plaintiffs are consumers of Cheerios who reside in California, New Jersey, and New York. Although each named Plaintiff can be associated with a particular state, the Amended Complaint is on behalf of all similarly situated individuals in the United States. Defendant, General Mills, a corporation organized and existing under the laws of the State of Delaware, maintains a principal place of business in Minnesota from where it markets, distributes, produces, and sells Cheerios throughout the United States[2].

This dispute revolves around Defendant's alleged misrepresentations regarding the health benefits of Cheerios. Plaintiffs contend that Defendant made "uniform representations concerning

---

[2]     Plaintiffs identified ten brands of Cheerios at issue in this case: (1) original Cheerios, (2) Honey Nut Cheerios, MultiGrain Cheerios, (4) Banana Nut Cheerios, (5) Cheerios Crunch, (6) Berry Burst Cheerios, (7) Frosted Cheerios, (8) Apple Cinnamon Cheerios, (9) Fruity Cheerios, and (10) Yogurt Burst Cheerios. When referring to those brands collectively the Court uses the blanket term "Cheerios."

the health benefits of Cheerios [which] are false, misleading and likely to deceive the consuming public because they misrepresent Cheerios' ability to reduce cholesterol, reduce the risk of heart disease and certain forms of cancer."   The most prevailing theme of the Amended Complaint was the representation concerning the alleged cholesterol-lowering benefits of Cheerios.  For example, according to Plaintiffs, Defendant advertised that Cheerios could lower a person's cholesterol by 4% in six weeks.

What led to the filing of this case was a May 5, 2009 warning letter from the Food and Drug Administration (the "FDA letter") to General Mills.  In the FDA Letter, the FDA reviewed the label and labeling of Cheerios® Toasted Whole Grain Oat Cereal.  The FDA's review found serious violations of the Federal Food, Drug, and Cosmetic Act (the Act)"  and the applicable regulations. The FDA noted that General Mill's  advertising practices improperly represented that Cheerios "was intended for use in lowering cholesterol, and therefore in preventing, mitigating, and treating the disease hypercholesterolemia which requires Cheerios to comply with drug regulations."  That is, Cheerios' representation to consumers about lowering their cholesterol levels by a certain percentage constituted a pharmaceutical formulation which would subject Cheerios to regulatory approval as a drug.  As a result of the FDA Letter, on May 19, 2009, six class action suits were filed in California, New York and New Jersey.   Subsequently, the United States Judicial Panel on Multidistrict Litigation Committee consolidated the Plaintiff's actions into this multi-district litigation[3].

In addition to the present action, there is a separate FDA proceeding pending wherein the

---

[3]     One Plaintiff, Charity E. Huey, also filed a complaint in California (Case No. 09-5152), but was dismissed from the case for failure to respond to discovery.

3

FDA is investigating the labeling of foods which advertise specific health benefits such as Cheerios. As a result of the FDA Letter, Cheerios has changed its label in order to avoid the drug approval process.

Plaintiffs also allege that the "health benefits of Cheerios, as represented by General Mills in its marketing, advertising, packaging, labeling and other promotional materials, are a material factor in the promotion of Cheerios, and have led directly to increased product sales, but are misleading and deceptive."

The Amended Complaint provides several examples of the allegedly deceptive statements. In one nationwide advertisement, General Mills stated that by eating Cheerios, "You can Lower Your Cholesterol 4% in 6 weeks."   The advertisement also stated that "a study showed that eating two 1 ½ cup servings[4] daily of Cheerios cereal reduced bad cholesterol when eaten as part of a diet low in saturated fat and cholesterol."   Another example is that the main label on the Cheerios box (or the "Principal Display Panel" ("PDP")) features a "fanciful depiction of a heart that is approximately one-third of the PDP's total height," and the label states that Cheerios can lower cholesterol by "10% in one month."   The label then states on the lower left-hand portion of the PDP that "Three grams of soluble fiber daily from whole grain oat foods, like Cheerios cereal, in a diet low in saturated fat and cholesterol, may reduce the risk of heart disease – a serving of Cheerios provides 1 gram per serving."   On the back of the Cheerios package, the label features in large print the word "WOW!"

---

[4]      According to the FDA, the claim of General Mills that eating 1 ½ cup servings daily of Cheerios cereal reduced bad cholesterol when eaten as part of a diet low in saturated fat and cholesterol "indicates that Cheerios is intended for use in lowering cholesterol, and therefore in preventing, mitigating, and treating the disease hypercholesterolemia." According to the FDA, the health benefits claimed by General Mills exceed those permitted for products that have not obtained FDA approval for marketing as a drug.

followed by the question, "I can help lower my cholesterol 10% in one month?"  Below that, the

label reads:

> A new study proves Cheerios' cereal plus a reduced calorie diet that
> is low in fat can help lower bad cholesterol about 10% in one month.
> The foods you eat or don't eat, along with your lifestyle habits  can
> really make a difference in lowering your cholesterol. Just follow
> these daily steps for one month to help lower your cholesterol.

General Mills also represents in its advertising that it is the only cereal that reduces cholesterol.  The

box label noted: "Number of other leading cold cereals clinically proven to help lower cholesterol.

0."

The Amended Complaint also alleges similar statements appear on the General Mill's website:

> "Made with whole grain, Cheerios is the only ready-to-eat cereal
> clinically proven to lower cholesterol when eaten as part of a diet low
> in saturated fat and cholesterol."

> "Our cereals can help lower your cholesterol!  As part of a heart
> healthy diet, the soluble fiber in Cheerios, Honey Nut Cheerios, and
> Berry Burst Cheerios can help reduce your cholesterol."

> "Eating Cheerios each day, as part of a diet low in saturated fat and
> cholesterol, can help lower your cholesterol, and that could help
> reduce your risk of heart disease."

> "Including whole grain as part of a healthy diet may . . . [h]elp reduce
> the risk of certain types of cancers.  Regular consumption of whole
> grains as part of, a low-fat diet reduces the risk for some cancers,
> especially cancers of the stomach and colon."

In the limited discovery conducted in advance of this motion, the five named Plaintiffs were

deposed and a summary is provided below.

Edward Myers

Mr. Myers is a resident of Hudson County, New Jersey.   Mr. Myers stated at his deposition

5

that prior to 2008, he often ate bacon, ham and eggs for breakfast before he began consuming Cheerios once per week for breakfast. In 2008, he changed his diet due to his cholesterol count and his doctor's orders. (T. 67, 14-15 and T. 15, 6-20). From 2008 forward, he "ate a lot of oatmeal," and he "still [eats] at lot of oatmeal." (T 20, 12-14). He also ate Cheerios once per week. (T. 20, 6-9). Since Mr. Myers worked as a limousine driver, and as a result, he dined at restaurants frequently, (T. 21, 10) he ate breakfast at Tommy's Restaurant in Jersey City, (T. 20, 20-21), Di Casa Napoli in Union City, (T. 20, 23-24) and at the Lincoln Inn in Jersey City. (T 21, 2-4). Although Mr. Myers can not estimate how often he ate Cheerios at the restaurants, he recalls that he often ate Cheerios elsewhere on  a regular basis including "a bowl of Cheerios and a banana" at his girlfriend's house in the evening. (T. 22, 4-15).

There was little testimony adduced as to whether Mr. Myers read the Cheerios box regarding the cholesterol-lowering benefit at either the restaurants or his girlfriend's house.  In addition, Mr. Myers liked the crunchiness and convenience of eating Cheerios. (T. 62, 13-15 and T. 68, 8-21).  Mr. Myers conceded that he ate the Cheerios not for any health benefit, but to keep "my belly . . . full." (T. 62, 19-23).

Mr. Myers ate Cheerios most of his life.  He began buying Cheerios in 1980 (after a divorce) because the yellow box was recognizable. (T. 70, 1-6). He noted "I seen whatever was in there and take one, sometimes two." (T. 70, 7-10).  At some point, other people bought Cheerios for Mr. Myers.  As Mr. Myers noted "I got a cleaning lady come in and I used to always give them money. I would just write down want I needed and she would get it . . .  Cheerios is what I put on it."  (T. 70, 13-20).  Hence, he did not know how much was paid or the size of the boxes purchased. When purchasing Cheerios, Mr. Myers would review the Cheerios box and he noted that the box

"said if you use Cheerios, it will lower your cholesterol," but he never saw the media advertisement claiming that Cheerios would lower his cholesterol by a certain percentage. (T. 79, 5-10, T. 79, 15-24).

More pertinent to the case, after a hospital stay in 2008 for cardiac problems, Mr. Myers' girlfriend mentioned the cholesterol-lowering benefit to him, and he began eating Cheerios from a box that had a red heart on the cover. (T. 82, 15 - T. 83, 7). On this Cheerios box, he read the front cover, but nothing on the back or side of the box. (T. 83, 11 - T. 84, 4). It is unclear whether it was Mr. Myers or his girlfriend who purchased the Cheerios; however, Mr. Myers could not recall the cost of the Cheerios, or whether the Cheerios that are in a box with a red heart on the box cost more than the boxes without the red heart. ( T. 84, 16-22 and T. 85, 2-5).

According to Mr. Myers, he ate Cheerios on the day of his deposition, and Mr. Myers did not discard the Cheerios after he learned of the FDA Letter. It appears that Mr. Myers was comfortable eating Cheerios before and after the FDA Letter for various reasons. Mr. Myers never visited the General Mills website.

Elsa Acevedo

Ms. Elsa Acevedo is a resident of Hudson County, New Jersey and she has been eating Cheerios for most of her life, including the day of her deposition. She testified that she suffers from high cholesterol and is under doctor's care for the condition. (T. 18, 9). Ms. Acevedo eats Cheerios because "they are very edible." (T. 18, 24). Ms. Acevedo saw a television commercial about Cheerios reducing cholesterol, and she began eating Cheerios more regularly. According to Ms. Acevedo, after viewing the commercial she "ran to the supermarket and bought a box" (T. 30, 15). She does not recall what she paid for the Cheerios at the Stop n Shop supermarket (T. 30, 18-21),

7

nor did she save any receipts to verify her purchases. (T. 31, 10-13).  Ms. Acevedo recalled that she

purchased Cheerios because what "caught my eye was like lower your cholesterol." (T. 56, 17-19).

Although she remembers the claim about the cholesterol-lowering benefit on the Cheerios box, Ms.

Acevedo had no recollection about a more specific representation such as a reduction of cholesterol

by "4 % in six weeks" or "10% percent in one month." (T. 60, 5-16).  Like Mr. Myers, Ms. Acevedo

ate Cheerios before, and continued to eat Cheerios after the FDA Letter was issued because "there

are very edible."  Ms. Acevedo never visited the General Mills website. (T. 92, 17-19).

Hobin Choi

     Mr. Hobin Choi is a resident of Los Angeles, California.  He has been eating Cheerios since

he was a kid. (T. 18, 20-24).  As an adult, he ate Cheerios because "it lowers cholesterol and . . . its

just like the common fact . . . you always want to lower your cholesterol."  (T. 22, 7-13).  Mr. Choi

understood that Cheerios might lower cholesterol since on "the box it said – right in blue . . .  said

something about lowering cholesterol or helps lower cholesterol" which was a "huge factor" in his

decision to purchase Cheerios.  He would eat Cheerios 3 to 5 times a day. (T. 58, 8-13). Mr. Choi

noted that "it embedded in my head that whatever I eat [something] that is  going to be healthier for

me . . [it makes] me want to buy it obviously." (T. 23, 13-18). Mr. Choi has not eaten Cheerios since

2009, (T. 25, 16) and that last time he bought Cheerios it cost – "around three to five bucks" (T. 26,

7-8) which he characterized as a  "guestimation." (T. 27, 18) and T. 31, 22-25). He has no receipts

from his purchases of Cheerios. Mr. Choi has never viewed the General Mills website. (T. 35, 14-

17).

Claire Theodore

     Ms. Claire Theodore is a resident of Monmouth County, New Jersey, but she purchased

Cheerios in California in 2008 and 2009 about eight times at Ralph's Store and the Pink Dot in Venice, California. (T. 21, 14 through T. 22, 8). Ms. Theodore has no receipts of purchase, but the price she paid was within a "range depending on the size of a box between two something and four something a box. I would guess." (T. 69. 1-5). Ms. Theodore did not recall the size of the box she purchased, but testified it was "not the biggest one [but] one that is a little bigger . . . than a piece of paper." (T 69, 10-12).

Ms. Theodore read the advertisement on the Cheerios package. The Cheerios package stated: "three grams of soluble fiber daily from whole grain oat food like Cheerios in a diet low in saturated fat and cholesterol may reduce the risk of heart disease." There was nothing about the cholesterol-lowering benefits which enticed her to buy Cheerios because, as Ms. Theodore commented, "I was not trying to lower my Cholesterol." Rather, Ms. Theodore, who has two young children, was impressed with "the simple ingredient list especially the whole grain oats and it's a part of a healthy diet, low in sugar, whole grains . . . no chemical preservatives." (T. 76, 10-25). Ms. Theodore remembers seeing a box of Cheerios "with a big heart and the ten percent in a month on the front" and she was "surprised" by the claim (T. 79, 19-25), but this representation did not support her decision to buy Cheerios. (T. 80, 1-15).

Ms. Theodore may have accessed the Cheerios website in 2003. At that time, she was attempting to locate and purchase a container that could be used to carry Cheerios for her baby. (T. 130, 1-10). There is no testimony that Ms. Theodore read the choice of law clause on the website.

Jeffrey Stevens

Mr. Jeffrey Stevens is a resident of New York. He was under doctor's care for his high cholesterol (T. 24, 18 through T. 25, 12). Due to his high cholesterol count, Mr. Stevens ate Cheerios

and shredded wheat for breakfast. (T. 67, 7-13).  Mr. Stevens liked Cheerios more than shredded wheat because "its offered in various flavors" (T. 88, 16-17), and lowering his cholesterol was his primary reason for eating it. (T. 88, 20-23).  Mr. Stevens did not remember the size of the box he purchased, but recalled it cost "around $4.00" (T. 93, 18-23). Mr. Stevens acknowledged that when Cheerios were on sale at the supermarket, and he and his wife "were looking for those bargains." (T. 96, 4-5).  He has no receipts from his purchases of Cheerios.

Mr. Stevens recollection of the Cheerios advertising is ambiguous.  For example, when asked if he looked at information about Cheerios, Mr. Stevens answered "no".  (T. 113, 10-14). Then he was asked about advertisements he saw, and he was "sure" he saw them, but did not "recall a specific thing." (T. 114, 20-22).  On the other hand, Mr. Stevens noted "when you're listening to TV and they're telling you to eat Cheerios and it will lower your Cholesterol, yeah, that could have played a part in it;" but he could not remember any specific advertisement (T. 115, 7-12 and T. 115, 21-25). Mr. Stevens was questioned about the cholesterol-lowering representations on the Cheerios box and any statements associated with that representation, and he stated "the number 5% comes to mind, but I don't know if — I just recall something about 5%, but he did not recall when or where he saw 5% enumerated. (T. 121, 7-16). Mr. Stevens could not "remember" whether any of the boxes he purchased stated that eating Cheerios could "lower your cholesterol 4% in six weeks" (T. 148, 19 through T. 149, 7), nor did he recall the 10% in one month representation. (T. 153, 16-25). Mr. Stevens never looked at the General Mills website. (T. 118, 7-8).

The Plaintiffs also rely on the Declaration of David Elmore, Jr. Mr. Elmore specializes in forensic and investigative accounting, and reviewed some of the 600,000 pages of documents proffered by General Mills.  The documents Mr. Elmore reviewed included "Cereal Benefits

10

Association Tracking - Post Wave by MarketTools (2/2006), Heart Health Competitive Review (7/28/08) by General Mills and Symphony IRI retail sales data.  Mr. Elmore determined from this data that the cost of Cheerios was about $2.52 per unit (box) in 2006 after sales redemptions. This determination is somewhat consistent with the testimony of the Plaintiffs who indicated the cost to be from "three to five bucks" or "between two something to four something".   Mr. Elmore's supplemental report notes that the cost of Cheerios rose by $.10 from 2006-2009 to the price of $3.06 (before sales redemption) while competitor's prices rose by $.05 to the price of $3.35 per box.

The report submitted by Mr. Elmore after his review of the documents provided by General Mills was an interim one, and to finalize it, Mr. Elmore indicated that more data was required.  Mr. Elmore, in vague terms, opined that he could use more data to refine his findings. He stated:

> a.      It is possible to calculate the average per unit retail price based on the Symphony IRI sales data for "yellow box" Cheerios;
>
> b.      It is further possible to calculate the average per unit reported net sales price  charged to retailers by General Mills, Inc.;
>
> c.      Based on the "yellow box" Cheerios profitability data, the average operating profit per unit and per ounce can be calculated;
>
> d.      With additional data any premium pricing charged by General Mills, Inc. for "yellow box" Cheerios over other competing brands could be calculated; and
>
> e.      To the extent additional data becomes available regarding the value to consumers of the health benefits promised within the marketing campaign for "yellow box" Cheerios, it is possible that additional analyses could be performed.

<u>Law</u>

The issues pending in this matter are the choice of law issue (i.e. should Minnesota law apply) and whether the Plaintiffs have suffered an injury or have sustained any measurable damages. The analysis is provided below.

<u>Choice-of-Law</u>

In MDL proceedings, the court often applies "the choice of law rules of the transferor courts." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997). The transferor courts here are California, New Jersey, and New York. When determining choice of law issues, New Jersey courts apply a "most significant relationship" test; and New York and California courts apply a "government interest test." *In re Mercedes-Benz, Tele Aid Contract Litig.*, 257 F.R.D. 46, 57 (D.N.J. 2009).

Plaintiffs believe that Minnesota law should apply because General Mills agreed to same on its website. In addition, Minnesota is the headquarters for the corporation and as such General Mills performed numerous operations there. Namely, the operations listed by Plaintiffs are:

•    Minnesota is the location of the marketing department for Cheerios. All of the individuals working within the marketing department for Cheerios, including the vice president of marketing for Cheerios who was the principal person responsible for approving the language contained on the labeling of Cheerios as well as in the advertisements, work out of General Mills' offices in Minnesota.

•    Minnesota is the location of the research and development department which plays a role in the marketing and advertising of Cheerios as well as in the approval of language used on the labels of Cheerios. All of the individuals working within the research and development

department work out of General Mills offices in Minnesota.

•       Minnesota is the location of the quality department which is responsible for reviewing the labeling of Cheerios before it is sent to the printer. All of the individuals working within the quality department work out of General Mills offices in Minnesota.

•       Minnesota is the location of the legal department which is involved in reviewing and approving the language used on the Cheerios labels and in the advertisements for Cheerios.

•       Minnesota is the location of the Bell Institute which was responsible for assisting General Mills with the science involved in their products, including Cheerios.

•       Minnesota is the location of the scientists and nutritionists employed by the Bell Institute who consulted with General Mills on the content of the labeling and packaging of Cheerios.

•       Minnesota is the location of where the marketing department, research and development department, legal department, the quality department and the Bell Institute all "collaborated" concerning the content of the language or the labeling for the Cheerios packaging as well as the language used in the advertising and marketing of Cheerios.

•        Counsel for General Mills has even acknowledged that the marketing of the Cheerios cereal at issue in Plaintiff's complaint emanated from decisions made at General Mills headquarters in Minnesota.  General Mills made this same acknowledgment on a call with Judge Arpert on December 12, 2011 concerning the status of discovery.

•       Minnesota is the location of focus groups, a form of "qualitative research" used by General Mills to assist it in its marketing of Cheerios.

•       Minnesota is the location of the "brand development" agency, Schawk, which assisted General Mills with the packaging of the Cheerios boxes.

• Minnesota is listed on the packaging of Cheerios boxes as the "General Offices" for General Mills.

• Minnesota is the location of each of the 12 custodians identified by counsel for General Mills as having relevant information to topics related to Cheerios marketing and the science involved in Cheerios.

Contrary to Plaintiffs' contentions, General Mills argues that the law of each state where each Plaintiff resides should be used to determine the law to be applied. To General Mills, the location of purchase, and where the Plaintiffs were when each read the representations should control. General Mills discounts the website reference to Minnesota law because none of the Plaintiffs viewed the choice of law provision on the website.

A. "Most Significant Relationship" Test (New Jersey)

Under New Jersey's "most significant relationship" test, before engaging in any substantive choice-of-law analysis, a court first must determine whether there is an actual conflict among the laws of these states. *Agostino v. Quest Diagnostics*, 256 F.R.D. 437, 461 (D.N.J. 2009). It is settled law that there are conflicts among the states' various consumer protection statutes. *See Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 247 (D.N.J. 2008); *Fink v. Ricoh Corp.*, 365 N.J. Super. 520, 584 (Super. Ct. Law Div. 2003). Moreover, Plaintiffs do not dispute that there is an actual conflict among the consumer protection statutes of New Jersey, California, New York, and Minnesota. (*See* Dkt. No. 37 at 14-15; Dkt. No. 68 at 27-28).

Having resolved the threshold issue, the next step of New Jersey's "most significant relationship" test requires analysis under section 148 of the Restatement (Second) Conflict of Laws *See P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008); *Agostino v. Quest Diagnostics*

*Inc.*, 256 F.R.D. 437, 462 (D.N.J. 2009).  In cases such as the one at bar, where "the plaintiff's action

in reliance took place . . . in a state other than where the false representations were made," a court

shall consider the following six factors:

> (a)     the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b)     the place where the plaintiff received the representations,
>
> (c)     the place where the defendant made the representations,
>
> (d)     the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e)     the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f)     the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) Conflict of Laws § 148(b).  In the instant matter, all of these factors militate

in favor of applying the law of the jurisdictions from where class members reside except factor (e),

which applies equally to each party and is therefore a nullity.  Plaintiffs argue that this situation is

identical to *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009), where

it was held New Jersey law applied to a multi-district litigation originating from six different states.

(Opp'n Br. at 9-12, citing *Mercedes-Benz*, 257 F.R.D. at 66-67).  This Court disagrees.  First, the

facts of *Mercedes-Benz* are slightly distinguishable.  In *Mercedes-Benz*, Mercedes-Benz U.S.A.,

L.L.C., headquartered in New Jersey, actively offered and provided the underlying subscription

service. *Mercedes-Benz*, 257 F.R.D. at 51.  In the instant case, General Mills sold Cheerios to local

retailers, and the local retailers resold Cheerios to Plaintiffs.  Second, in *Mercedes-Benz*, the Court

stressed the availability of treble damages under the NJCFA as evidence that New Jersey had the strongest interest in applying its own law. *Mercedes-Benz*, 257 F.R.D. at 68.  In this case, there is no corresponding interest in applying Minnesota law. (*See* Opp'n Br. at 10 n.9 ("Minnesota does not allow treble damages . . .")). More specifically, Plaintiffs can not rely on any representations made by General Mills on their website because none of them had ever viewed it.

　　　　In sum, factors (a), (b), (e), and (f) point to the using the law of the states of purchase while only factor (c) points to using Minnesota law.  The next step of the "most significant relationship" test requires the Court to examine these contacts in light of the principles stated in Restatement (Second) Conflict of Laws § 6. *See P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 147 (2008). "Reduced to their essence, the § 6 principles are: '(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states.'" *Id.* (quoting *Erny v. Estate of Merola*, 171 N.J. 86 (2002)).  Here, Minnesota has no interest in compensating out-of-state consumers. *Cf. Gray v. Bayer Corp.*, Civ. No. 08-4716, 2011 WL 2975768, at *5 (D.N.J. July 21, 2011).  Moreover, Plaintiffs only transacted with local retailers and had no direct involvement with General Mills in Minnesota. Minnesota's only contacts with this litigation is by way of Defendant's headquarters. In contrast, Plaintiffs' respective home states have clear interests. The Court thus concludes that the "interests of interstate comity" and the "competing interests of the states" counsel in favor of applying the law of the various jurisdictions from which class members will be drawn.  Thus in the instant matter, having analyzed the contacts under § 148 and in light of the principles stated in § 6 of the Reinstatement, the Court will apply state law. For example, New Jersey law will apply to the New Jersey Plaintiffs, Edward Myers and Elsa Acevedo.

16

B.  "Government Interest" Test (California & New York)

`       The "government interest" test requires the Court to first determine whether a conflict exists

between the laws of the interested states. *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D.

46, 56 (D.N.J. 2009).  If no conflict exists, the Court will apply the law of the forum state, in this

case New Jersey. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (2006); *Karaha Bodas*

*Co., LLC v. Perushahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 85 (2d Cir.

2002).  However, "if the court finds that there is a true conflict," then the Court "carefully evaluates

and compares the nature and strength of the interest of each jurisdiction in the application of its own

law to determine which state's interest would be more impaired if its policy were subordinated to

the policy of the other state." *Kearney*, 137 P.3d at 922; *see also Istim, Inc. v. Chem. Bank*, 581

N.E.2d 1042, 1044 (1991).  Importantly, "under the 'interests analysis' approach, the law of the

jurisdiction having the greatest interest in the litigation will be applied and only facts or contacts

which obtain significance in defining State interests are those which relate to the purpose of the

particular law in conflict." *Istim, Inc. v. Chem. Bank*, 581 N.E.2d 1042, 1044 (1991).

As explained above, a conflict exists between the consumer protection laws of Minnesota,

California, and New York. (*See* Dkt. No. 37 at 14-15; Dkt. No. 68 at 27-28).  Thus, the Court must

"evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the

application of its own law." *Kearney*, 137 P.3d at 922.  In the instant matter, discovery has confirmed

that the New York and California Plaintiffs purchased Cheerios within their home states.

Additionally, neither the California Plaintiffs nor the New York Plaintiffs read Defendant's website

provision about conflicts of law during the relevant time period.  Based on these facts, the Court has

determined that each state's interest in applying their own consumer protection law to their own

17

citizens outweighs any interest possessed by Minnesota.  Thus the Court will apply New York law

to the New York Plaintiff (Jeffrey Stevens) and California law to the California Plaintiffs (Claire

Theodore and Hobin Choi). As such, the four counts concerning Minnesota statutes are dismissed.

Standing to Sue

Generally, to meet the constitutional requirement to sue, there must be concrete injury, as

well as two other requirements. As Judge Roth enunciated:

> To prove constitutional standing, Koronthaly must demonstrate (1) an
> injury-in-fact that is actual or imminent and concrete and
> particularized, not conjectural or hypothetical, (2) that is fairly
> traceable to the defendant's challenged conduct, and (3) is likely to
> be redressed by a favorable judicial decision. Summers v. Earth
> Island Inst., --- U.S. ----, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009)

*Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. Appx. 257 (2010).  This motion concerns whether there

is an injury-in-fact that is actual or imminent and concrete and particularized.  The briefing of the

parties often referred to the damages alleged by the Plaintiffs such as the return of the full purchase

price, benefit of the bargain damages, and disgorgement of profits (Amended Complaint, paragraphs

73, 83, 89, and 138).

Plaintiffs May Not Recover Full Purchase Price Refunds.

Plaintiffs seek a full refund for all boxes of Cheerios that Plaintiffs purchased during the

relevant time-frame. Plaintiffs state that Defendant's actions harmed Plaintiffs because Plaintiffs

"would not have purchased Cheerios" but for Defendant's "deceptive practices." That assertion does

not comport with the testimony of the Plaintiffs.  Mr. Myers, Ms. Acevedo and Ms. Theodore

testified that they still eat or purchase Cheerios today for various reasons including the ingredients

(Ms. Theodore), and the taste (Mr. Myers and Ms. Acevedo) and convenience. See, *Romano v. Galaxy Toyota*, 399 N.J. Super. 470, 483 (App. Div. 2008).  Generally, "the 'out-of-pocket' theory applies when the purchase price of a misrepresented product [may be refunded]  so long as . . . *the seller's misrepresentations rendered the product essentially worthless*." *Mann v. TD Bank, N.A.*, 2010 WL 4226526, at *5 (D.N.J. Oct. 20, 2010) (citation omitted) (emphasis added).

Here, there is no indication that Defendant's misrepresentation "rendered the product essentially worthless." *Mann*, 2010 WL 4226526 at *5 (citation omitted). Ms. Acevedo and Mr. Myers purchased their Cheerios for crunchiness, taste, convenience and to keep ones "belly full" as well as to lower their cholesterol.  Moreover, Ms. Theodore, like many mothers, selected Cheerios due to its healthy, simple ingredients for her children.   The contention that these Plaintiffs would not have purchased Cheerios but for Defendant's misrepresentation seems tenuous especially since Mr. Myers and Ms. Acevedo still eat Cheerios today.  Moreover, Ms. Theodore had no loss because she purchased Cheerios for the ingredients, hence she did not rely on the cholesterol-lowering benefit. See,  *Mason*, 2011 WL 1204556 at *4.  As such, Plaintiffs fail to adequately allege that Plaintiffs are entitled to full purchase price refunds when they ate the Cheerios after learning of the FDA Letter, and are still eating them today for other reasons.

The Plaintiffs rely on  *Lee v. Carter Reed*, 4 A. 3d 561 (2010). In *Lee*, Plaintiffs had purchased a substance called Relacore which was manufactured by the defendant. Relacore was a weight reduction product that shrinks belly fat and decreases anxiety. The named plaintiff paid $120.00 for three bottles of Relacore.  The representations of defendant Carter Reed about the benefits of Relacore were deceptive.   In *Lee*, one of the issues was whether there was an ascertainable loss. The Supreme Court of New Jersey noted that a loss cannot be hypothetical or

19

illusory, but is "an out-of-pocket loss, and/or replacement cost." *Id*. at 576-77. *See, Thiedemann v. Mercedes-Benz USA*, 872 A. 2d 783 (2005). In *Lee*, the Court found the ascertainable loss to be "the purchase price of a bottle of broken promises" and the Court considered the cost of Relacore as an out-of-pocket loss. *Lee*, 4 A. 3d at 580. The *Lee* case is distinguishable from this case. Unlike consumers of Cheerios, once the consumer knew of the deception, they immediately ceased using Relacore. The same is not true in this case – Mr. Myers and Ms. Acevedo still eat Cheerios; and Ms. Theodore never accepted any representation regarding lowering cholesterol (i.e. no broken promise to her). Hence, return of purchase price is beyond any loss sustained when the Cheerios were fully consumed for other reasons.

Plaintiffs May Not Receive "Benefit of the Bargain" Damages.

Plaintiffs alternatively seek the difference between what Plaintiffs paid for Cheerios and the price that Plaintiffs would have paid for Cheerios, if Defendant had not engaged in the alleged misrepresentation. Plaintiffs state that Defendant's actions harmed Plaintiffs because Plaintiffs would not have paid as much money for Cheerios but for "[Defendant's] deceptive practices." This theory of relief is equally flawed. Plaintiffs allege that they "paid money for a product that was of lesser value than what was represented." *Mason*, 2011 WL 1204556 at *4 (internal quotation marks and citation omitted); *see also Solo v. Bed Bath & Beyond, Inc.*, 2007 WL 1237825, at *3 (D.N.J. Apr. 26, 2007) ("Plaintiff fails to specifically allege that what he did receive was of lesser value than what was promised, i.e., that the sheets he received were worth an amount of money less than the sheets he was promised . . . ."). The *Mason* analysis on this issue is instructive:

> When plaintiffs purchased Diet Coke Plus, they received a beverage
> that contained the ingredients listed on its label. Plaintiffs have not
> explained how they experienced any out-of-pocket loss because of

20

> their purchases, or that the soda they bought was worth an amount of
> money less than the soda they consumed. At most, plaintiffs simply
> claim that their expectations of the soda were disappointed.
> Dissatisfaction with a product, however, is not a quantifiable loss that
> can be remedied under the [New Jersey Consumer Fraud Act].

*Mason*, 2011 WL 1204556 at *4 (citations omitted).

Based on *Mason*, Plaintiffs do not adequately allege "benefit of the bargain" damages.  As this Court has previously noted, the Amended Complaint "floats upon the FDA's letter and findings."  (Transcript of September 1, 2010 Hearing, 15:11-12).  Plaintiffs' allegations regarding "an apparent and somewhat arcane [alleged] violation of FDA food labeling regulations" does not show that Plaintiffs purchased boxes of Cheerios that did not contain the ingredients listed on the Cheerios boxes.  *Mason*, 2011 WL 1204556 at *5, n.4.  Moreover, the Plaintiffs, except for Mr. Choi and Mr. Stevens, consumed all of the Cheerios purchased for various reasons such as convenience and crunchiness. Plaintiffs therefore fail to adequately allege that Plaintiffs suffered "benefit of the bargain" damages.

Plaintiffs generally rely on the case of *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99 (D.N.J. 2011) to support their benefit of the bargain argument.  In *Smajlaj*, one of the major issues was "whether the allegations . . . are sufficiently plead an 'ascertainable loss' as required for a claim under the New Jersey Consumer Fraud Act." *Id.* at 84.  In *Smajlaj*, the Plaintiff's contention was that Campbell Soup advertised low sodium soup when in fact the low sodium soup contained the same amount of sodium as other regular Campbell soups.  The cost of the low sodium soup was 20 to 80 cents higher than the regular soups.  According to the District Court, the benefit of the bargain theory "requires nothing more than the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised." *Id.* at 99.  However, the district court

noted that "a consumer has not experienced any injury if the consumer merely has some expectation about a product that is not met." *Id.* at 99-100. "But if the consumer received a product that "was worth objectively less than what one could reasonably expect," then that type of defeated expectation is an injury." *Id.* See also *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. App'x 257, 259 (3d Cir. 2010). In light of that background, the District Court in *Smajlaj* set forth the standard for finding a benefit of the bargain loss, as

> A plaintiff alleging a benefit-of-the-bargain states a claim if he or she alleges (1) a reasonable belief about the product induced by a misrepresentation; and (2) that the difference in value between the product promised and the one received can be reasonably quantified.

*Smajlaj*, 782 F. Supp. 2d at 99. In applying the standard to this matter, the Plaintiffs do not objectively quantify their loss. For instance, Mr. Theodore can not meet part 1 of the aforementioned test because she did not rely on the cholesterol lowering representation. Mr. Myers and Ms. Acevedo can not meet part 2 of the test because they still eat Cheerios today; hence, the misrepresentation did not alter their selection of purchasing Cheerios. In addition, none of the plaintiffs estimated any loss amount, or a difference in price between a comparative produce and Cheerios. Plaintiffs therefore fail to adequately allege they suffered a benefit of the bargain loss.

Plaintiffs Are Not Entitled to Disgorgement of Profits.

Plaintiffs additionally seek to recover "equitable monetary relief as may be necessary to disgorge and/or restore monies received by Defendant as a result of Defendant's alleged deceptive conduct." (*See* Amended Complaint, Prayer, ¶ E). Like the two prior theories of relief, Plaintiffs' request for disgorgement of profits fails. "Liability to disgorge profits is ordinarily limited to cases of . . . conscious wrongdoing." Restatement Third, Restitution and Unjust Enrichment, Vol. 1 § 3,

p. 22 (2011).  Accordingly, disgorgement does not apply to "innocent recipients" or "inadvertant tortfeasors".  *Id*.   In this case, it was surprising for the FDA to assert that Cheerios must seek regulatory approval as a drug, in order to represent that Cheerios could lower cholesterol.  Generally, the cholesterol-lowering representation may be true in a broad sense that whole wheat oats are more heart "friendly" than the ham and eggs Mr. Myers chose to eat previously.  Parenthetically, the FDA will permit unqualified health claims based upon significant scientific agreement among experts.  See, *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales.*, 701 F. Supp. 2d 356, 363 (EDNY 2010).  As such, Cheerios broad representation about lowering cholesterol does not appear to be a deliberate misrepresentation by a conscious wrongdoer as set forth by Plaintiffs.

Unjust enrichment is not a viable theory – and disgorgement is therefore not available – in circumstances in which a consumer purchases specific goods and receives those same specific goods.  *See Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 505 (D.N.J. 2006).  In order to obtain disgorgement of profits, a plaintiff must demonstrate that a defendant was unjustly enriched.  *See generally*, *Illiadis v. Wal-Mart Stores, Inc.,* 191 N.J. 88, 110 (2007).  An unjust enrichment cause of action arises where: (1) a defendant received a benefit from the plaintiff; and (2) the defendant's retention of such a benefit is inequitable. *United States v. Albinson*, 2010 WL 3258266, at *18 (D.N.J. Aug. 16, 2010) (citation omitted).  As mentioned, Plaintiffs fail to demonstrate that they purchased Cheerios for which they did not receive any value.  Healthy ingredients, crunchiness, convenience and taste are value components.   *Mason*, 2011 WL 1204556 at *5, n.4.  As such, Plaintiffs have not set forth a viable unjust enrichment cause of action, and disgorgement of profits is not an appropriate remedy. See, *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. App'x 257, 259 (3d Cir. 2010) (wherein a plaintiff lacked standing to sue).  The *Koronthaly* court stated "absent any

23

allegation that she received a product that failed to work for its intended purpose or was worth objectively less . . . [plaintiff] has not demonstrated a concrete injury in fact" as to the lipstick she purchased. Similarly here, Plaintiffs Mr. Meyers, Ms. Acevedo and Ms. Theodore have not shown any concrete injury.

Equitable relief such as disgorgement is often ordered when no other form of relief will compensate for the injury. Often in class actions, the theory is that a class action will address a wrong which will otherwise not be remedied. Here, the FDA notified Cheerios of the over-aggressive labeling, and Cheerios has entered discussions with FDA representatives. As such, the wrong will be remedied in some fashion through regulatory intervention. As such, no other equitable relief is necessary since the representations have been addressed.

From reading the above, there is little discussion about Mr. Choi and Mr. Stevens. The class action claims must be dismissed for the following reason. Fed. R. Civ. P. 23. Generally, "the claims . . . of the representative parties are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Here, Mr. Choi consumed Cheerios two or three times per day and stopped eating Cheerios when he learned of the FDA Letter. Mr. Stevens on the other hand had very little recollection about the content of the Cheerios advertisements, and, he may not be a credible complainant to represent a class due to his faulty memory. Although Mr. Choi and Mr. Stevens may have some injury, their cases can not be considered typical. The cases of Mr. Myers, Ms. Acevedo and Ms. Theodore show that many Cheerios consumers buy them for different reasons and General Mills should be allowed to litigate each claim on the factual differences. As such, the class allegations of Mr. Choi and Mr. Stevens are dismissed.

<u>Order</u>

This Court has reviewed all submissions and heard oral argument.  For the reasons set forth in the above Memorandum,

IT IS on this 10th day of September, 2012,

ORDERED that Count 1 (Minnesota Consumer Fraud Act), Count 2 (Minnesota Unlawful Trade Practices Act), Count 3 (Minnesota Deceptive Trade Practices Act), and Count 4 (Minnesota False Statement in Advertising Act) are dismissed; and it is further

ORDERED that Defendant's motion for summary judgment is granted against Mr. Myers, Ms. Acevedo and Ms. Theodore; and it is further

ORDERED that Defendants motion for summary judgment is granted on all class action allegations of Mr. Jeffreys' and Mr. Choi's amended complaint.


*s/Peter G. Sheridan* _____
PETER G. SHERIDAN, U.S.D.J.